ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

MARK J. WENKER
Assistant U.S. Attorney
Arizona State Bar No. 018187
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
mark.wenker@usdoj.gov
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>v.<br><br>$8,545.00 in United States Currency,<br><br>                    Defendant *In Rem*. | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |

Plaintiff United States of America brings this Complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (Supplemental Rules):

**<u>NATURE OF THE ACTION</u>**

1.      This is a civil action *in* rem, brought to enforce the provision of 21 U.S.C. § 881(a)(6) for the forfeiture of United States currency which represents money or other things of value furnished or intended to be furnished in exchange for a controlled substance, proceeds traceable to such an exchange, and money used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. §§ 801, *et seq.*

2.      This is a civil action *in rem*, brought to enforce the provision of 18 U.S.C. § 981(a)(1)(C) for the forfeiture of United States currency which constitutes or is derived from proceeds traceable to a violation of a specified unlawful activity, including but not limited to dealing in a controlled substance and 18 U.S.C. § 1952, travel in interstate commerce with the intent to distribute proceeds of unlawful activity as defined in 18 U.S.C. §§ 1952, 1956(c)(7) and 1961.

3.      Venue and jurisdiction in Arizona are based upon 21 U.S.C. § 881(j), and 28 U.S.C. §§ 1355(b) and 1395 as acts and omissions occurred in the District of Arizona that give rise to this forfeiture action.  This Court has jurisdiction.  28 U.S.C. §§ 1345 and 1355, and 18 U.S.C. § 981(h).

## THE DEFENDANT *IN REM*

4.      The defendant consists of $8,545.00 in United States currency (Defendant Property) seized on August 8, 2018.  The Defendant Property is currently in the custody of the Drug Enforcement Administration (DEA).

## INTRODUCTION

5.      The following information depicts an investigation conducted by the members of the Phoenix Commercial Narcotics Interdiction Unit (CNIU), based out of the Phoenix Sky Harbor International Airport, to which DEA Special Agent (SA) William S. Neal is assigned.  The primary responsibility of this unit is to investigate crimes involving the use of commercial airlines and shipping companies to transport illegal drugs and drug proceeds.

6.      Based upon the experience of CNIU investigators and investigations across the country, it is common knowledge that cities located in the Midwest and on the East

Coast are known demand locations for illicit drugs.  States such as Arizona and California are source locations due to their close proximity to the border of Mexico and established drug transportation routes.  People involved in the illegal drug trade often hire couriers to transport drugs and/or proceeds from the sale of drugs by utilizing commercial airlines and shipping companies.  In an effort to identify and disrupt potential drug and/or money couriers related to drug organizations and criminal syndicates, investigators utilize a variety of resources, including confidential informants, suspicious flight itineraries, other law enforcement agencies, and prior knowledge of criminal activity or intelligence.

7.     Factors that constitute suspicious flight itineraries include airfare purchase at the counter immediately prior to departure or short notice reservations for a one-way travel, sometimes paid in cash.  Couriers travel with minimal or no luggage and often will attempt to board the aircraft at the last possible moment.  Drug and/or money couriers utilize these techniques in an attempt to conceal their identities from law enforcement authorities and minimize their exposure to commercial airlines.

**BACKGROUND**

8.     On Monday, August 8, 2018, members of the CNIU received a "ticket tip" from DEA Cincinnati, Ohio, Task Force Officer (TFO) Eli Sautter (Sautter) that passengers Marcellus Ross Parham (Parham) and Ciara Elizabeth Bowling (Bowling) were traveling together aboard American Airlines Flight 2574 from St. Louis, Missouri, to Phoenix, Arizona with a final destination of San Diego, California.

9.     TFO Sautter initiated the investigation because Parham purchased travel tickets within the last 48 hours, one way.

10.     Parham and Bowling were assigned airliner seats 23E and 23F.

11.     Prior to the flight's arrival in Phoenix, an Intel analyst ran a criminal history on Parham and Bowling and found previous arrests for illegal drugs.

12.     Prior to the flight arriving, CNIU investigators also received photos and physical descriptions of Parham and Bowling from TFO Sautter.

13.     CNIU investigators knew that neither Parham nor Bowling had a checked bag.  As mentioned, couriers frequently travel with little or no baggage.

14.     American Airlines Flight 2574 was due to arrive at Phoenix Sky Harbor International Airport at 9:59 a.m. at Gate B9.

15.     Based on the above information, including the drug demand/source relationship between the cities, CNIU investigators decided to attempt a consensual encounter with Parham and Bowling when they arrived.

16.     SA Neal, CNIU Detective Pablo DeSantiago (Detective DeSantiago), CNIU Detective Aaron Rodriguez (Detective Rodriguez) and CNIU Detective Kevin Koontz (Detective Koontz) proceeded to Gate B9 and stood just outside of the jetway as the flight unloaded.

17.     After a few minutes, CNIU investigators observed two subjects matching Parham and Bowling's descriptions exit the jetway. The passengers walked down the concourse toward the flight monitors.  CNIU investigators decided to make contact with the two subjects at this time.

18.     Parham and Bowling were contacted in a wide-open, public walkway, where their ability to leave the encounter was not obstructed.

4

19.     Parham and Bowling were free to leave the consensual encounter if they chose to do so.

20.     Detective Koontz approached Parham from his right shoulder and introduced himself while displaying his credentials.

21.     Parham provided Detective Koontz a ticket with his name on it.   After viewing the ticket, Detective Koontz handed it back to Parham.

22.     Detective Rodriguez made contact with Bowling who was standing next to Parham.

23.     Detective Koontz explained to Parham what his responsibilities are at the airport and that he received a tip on Parham based on his travel itinerary.

24.     Detective Koontz pointed towards Bowling and asked Parham if he was traveling with her.

25.     Parham confirmed that he was traveling with Bowling.

26.     Detective Koontz asked Parham where he was traveling to and Parham stated San Diego, California.

27.     Detective Koontz asked Parham if he purchased his ticket within the last 48 hours and Parham stated he did.

28.     Detective Koontz asked Parham for the reason for his travel and Parham stated that he was going to see family.

29.     Detective Koontz asked him if he packed his own backpacks and Parham stated that he did.

30.     Detective Koontz asked Parham if anyone asked him to carry anything for him and Parham stated no.

31.    Detective Koontz informed Parham that he works narcotics at the airport and asked Parham if he was traveling with any illegal drugs or large amounts of U.S. currency and Parham stated no.

32.    Detective Koontz asked Parham if CNIU investigators could check for the items Detective Koontz mentioned and Parham consented to a search and stated he was in a hurry to catch his connecting flight.

33.    This seemed suspicious to CNIU investigators because according to Parham's flight itinerary his connecting flight to San Diego, California, departed at 2:05 p.m.

34.    CNIU investigators conducted cursory searches of a pink duffel bag and two backpacks Parham was carrying.  They located a bundle of U.S. currency in one backpack and a rubber-banded bundle of U.S. currency in another backpack.

35.    This pink duffel bag was later determined to be Bowling's bag.

36.    Detective Koontz asked Parham if that was all the money he was carrying and Parham stated that it was.

37.    Detective Koontz asked Parham how much money he was traveling with, referring to the money in his backpacks, and Parham stated it was just a couple grand.

38.    Detective Koontz asked Parham again the total amount of money he had and Parham stated $5,000.00.

39.    Detective Koontz asked Parham the source of the money and Parham stated that he banks with Bank of America and that he took the money out of the bank recently.

40.   While conducting the cursory searches of Parham's backpacks, CNIU investigators smelled a strong odor of marijuana emitting from them.

41.   Detective Koontz informed Parham that the backpacks smelled like marijuana and Parham stated he smokes marijuana.

42.   Detective DeSantiago located a clear ziplock bag containing what appeared to be high-grade marijuana.

43.   Parham looked at the bag of marijuana and said that he forgot about it and that he did not mean to bring it and had meant to leave it at his house.

44.   Detective Koontz asked Parham if he has ever been arrested or in trouble with law enforcement and Parham stated no.

45.   While Detective Koontz was speaking to Parham, Detective Rodriguez interviewed Bowling.

46.   Bowling was carrying a purse and a plastic retail bag.

47.   It also was determined that Parham was carrying Bowling's pink duffel bag and it contained some of both Bowling and Parham's clothes.

48.   Detective Rodriguez asked if he could speak to Bowling while identifying himself and showing her his police credentials and Bowling agreed that Detective Rodriguez could speak with her.

49.   Bowling provided an identification card, and Detective Rodriguez informed her that he was a narcotics investigator.

50.   Bowling confirmed that she was traveling to San Diego with Parham.

51.   Bowling confirmed that she and Parham were traveling on one-way tickets purchased within the previous 24 hours.

52.    Bowling denied being in possession of drugs, drug paraphernalia, or any large sums of cash.

53.    When asked if she was in possession of any cash, Bowling stated that she had a couple hundred dollars.

54.    Bowling pointed at a duffel bag that was lying next to Parham and stated that it was hers, but it may have some of Parham's stuff in it.

55.    Detective Rodriguez asked for permission to search Bowling's purse and she consented to the search.

56.    While searching the purse, Detective Rodriguez could smell a strong odor of marijuana coming from her purse.

57.    Bowling denied being a marijuana smoker.

58.    Bowling told Detective Rodriguez that she had $3,000.00.

59.    Bowling stated that she had given her money to Parham but did not know where he put it.

60.    Detective Koontz informed Parham that CNIU investigators would need to speak to him in the Phoenix CNIU on-site airport office (CNIU office) to discuss the money and marijuana Parham with which he was traveling.

61.    Detective Rodriguez asked Bowling to accompany CNIU investigators to the CNIU office.

62.    Both Parham and Bowling complied with the request to go to the CNIU office.

63.    The U.S. currency was left in the backpacks, which were returned to Parham and Bowling to carry to the CNIU office.

64.    Once in the CNIU office, Parham and Bowling were interviewed in separate offices.

65.    While walking to the CNIU office, Detective Rodriguez asked Bowling when she last counted her money and she stated that she counted her money the previous day.

66.    Bowling said that half of the money Parham had was hers.

67.    Bowling advised she did not know where Parham had placed the money that belonged to her.

68.    Bowling claimed that she had given him $4,000.00, which consisted of twenties and a couple hundred-dollar bills.

69.    Bowling did not know why she asked him to carry her money.

70.    Bowling stated that Parham purchased her plane ticket and she was just "along for the ride."

71.    SA Neal conducted a search of Parham's backpacks in the CNIU office. SA Neal located the U.S. currency hidden in Parham's backpack and removed it.

72.    While conducting the search of Parham's backpacks in the CNIU office, SA Neal located a second clear bag containing marijuana.

73.    Parham stated that both bags of marijuana belonged to him and that he flew to Chicago recently and forgot about them.

74.    CNIU investigators normally have a drug sniffing K-9 to examine currency to see if it had been around illegal drugs recently, but because of the strong odor of marijuana present on Parham's backpacks and the fact that marijuana was actually located

in the backpacks, a K-9 inspection was not necessary.

75.     SA Neal also located a small ziplock bag commonly used to carry illicit drugs in Parham's backpack. The small clear 1"x1" bag contained Xanax, a dangerous drug, and oxycodone, a narcotic drug.

76.     Parham stated that he had prescriptions for the pills but he did not have his prescription bottles with him.

77.     Detective Koontz explained to Parham the laws in reference to carrying prescription narcotics and dangerous drugs.

78.     Parham stated that he would send Detective Koontz prescription information for the pills.

79.     Detective Koontz provided Parham with an email address to send the prescription to, but Parham did not send any documentation or prescription information.

80.     Detective Koontz read Parham his Miranda rights at 10:21 a.m. and Parham responded "Yes I do" to understanding his rights and he agreed to speak with Detective Koontz.

81.     Detective Koontz asked Parham if he had ever been arrested and he stated that he was arrested in the past. It should be noted that earlier when Detective Koontz first contacted Parham, Parham stated that he had never been arrested.

82.     CNIU investigators know it is common for illegal drug dealers and couriers to minimize their criminal history when contacted by law enforcement.

83.     Detective Koontz asked Parham if all the money that CNIU investigators located belonged to him. Parham stated that the money located in Bowling's bag

10

belonged to her.

84.     Parham stated he and Bowling were going to see family and vacation in California, which was why he and Bowling brought money.

85.     Parham asked Detective Koontz if his money would be returned to him after the currency was counted as he did not want to go to California without any money.

86.     Parham stated he thought it was illegal to travel with over $10,000.00.

87.     CNIU investigators know that money couriers often believe that the international law in reference to traveling with over $10,000.00 applies to domestic flights as well.

88.     For a third time, Detective Koontz asked Parham how much money he had with him and Parham stated that his money, combined with Bowling's money, totaled no more than $6,000.00.

89.     Detective Koontz asked Parham how much money Bowling had and Parham stated $1,000.00.

90.     Detective Koontz said to Parham that Parham mentioned earlier that he took some of the money out of the bank.  Parham stated that he took about $2,000.00 from his bank account a week ago.

91.     Parham informed Detective Koontz that he did not have access to online banking and he did not have a bank receipt with him showing the withdrawal.

92.     Parham was traveling with three cell phones.  Detective Koontz asked Parham if all three phones belonged to him and Parham said they did.

93.     Parham informed Detective Koontz that he only uses two of the phones

and the third phone is only used for music.

94.     CNIU investigators know it is common for illicit drug dealers to utilize multiple cell phones.

95.     Parham stated that the cell phone he uses for music is not active.

96.     Parham gave Detective Koontz permission to look through the cell phone he uses for music for the assigned phone number and Detective Koontz located the number, which is 636-633-2414.  The phone is still active through T-Mobile.

97.     Parham gave Detective Koontz permission to look through his phones for recent phone numbers.

98.     CNIU investigators discovered that recent phone numbers located on his phone were linked to individuals with numerous drug-related charges.

99.     Parham began telling Detective Koontz that having marijuana was not a big deal.

100.     Detective Koontz informed Parham that carrying marijuana when traveling by plane is illegal in most states.

101.     Detective Koontz asked Parham if marijuana was legal in St. Louis and Parham stated that it was not.

102.     Detective Koontz asked Parham if he purchased the marijuana when he was traveling in St. Louis, Missouri, and Parham stated that he purchased the marijuana in Illinois.

103.     Detective Koontz asked Parham if the money he was traveling with was

going to be used to purchase marijuana in California. Parham stated that he intended to have fun and that he and Bowling were going to smoke when they were in California.

104.    Detective Koontz asked Parham for the name of the strain of marijuana he was traveling with and Parham stated Gorilla Glue.

105.    CNIU investigators know that high-grade marijuana will typically be assigned a name from the grower or dispensary that it came from depending on the where the seeds came from and the quantity of THC.

106.    Detective Koontz asked Parham for the total amount in weight of the marijuana he was traveling with was and Parham stated 22 grams.

107.    Parham said he purchased 14 grams from one dispenser, 14 grams from another dispenser, and he smoked a little of it.

108.    Detective Koontz asked Parham how long ago he purchased the marijuana and Parham stated one week ago for $100.00 from each dispenser.

109.    Detective Koontz asked Parham if he was currently employed and Parham stated that he was not.

110.    Detective Koontz asked what was the last job Parham held and Parham stated the job was in the automotive business and he worked on cars.

111.    Parham said he was laid off in December 2017.

112.    Detective Koontz asked Parham if he filed taxes in 2017 and Parham stated no and that he never made enough to file taxes.

113.    Detective Koontz asked Parham where all the money came from that he

was traveling with since he has not had a job for eight months.

114.     Parham said he sells cars and that the little money he did have he purchased a vehicle and sold it and Parham stated the last time he sold a vehicle was on Offer Up, on July 27, 2018, for $2,600.00.

115.     Detective Koontz asked him if he had the information on the person who purchased the vehicle and Parham said no.

116.     Detective Koontz asked Parham if he could show him a record of the sale from Offer Up and Parham said he only had that information on his laptop.

117.     A vehicle registration check was later conducted on Parham and no vehicle registrations were found for Parham.

118.     A check of the insurance claims databases did not show any reports listing Parham as a claimant or associated with any vehicles.

119.     Parham also was found to have no reported wages in the state of Missouri.

120.     Detective Koontz asked Parham where he was staying when he arrived in California and Parham said that they were going to stay in San Diego and then head up to Los Angeles.

121.     Parham stated after this trip he was probably just going to go back home.

122.     Parham then said he should be cool because he was traveling with under $10,000.00.  Detective Koontz again explained to Parham that it was not illegal to travel with more than $10,000.00 in the United States.

123.     Detective Koontz told Parham that it would have made more sense to leave the money in his bank account and draw it out when he was in California and Parham

said that last time he did that the bank froze his account.

124.    Detective Koontz informed Parham that all you need to do is let the bank know ahead of time that you will be traveling to another state.

125.    Detective Koontz asked Parham where the money came from that Bowling was carrying and Parham stated that Bowling works at a sports bar.

126.    Detective Rodriguez, who was interviewing Bowling, asked Parham how much of the money belonged to her and Parham said about $600.00.

127.    Detective Rodriguez then asked Parham how much money Bowling gave him yesterday and Parham said that she gave him $600.00 or $1,600.00.

128.    Detective Rodriguez informed Parham that Bowling claimed to have given him $4,000.00 yesterday and that Parham had an additional $4,000.00.

129.    Parham said "what" in a surprised tone to this claim.

130.    Detective Rodriguez then asked Parham if any of the money belonged to Bowling.

131.    Parham was quiet for a moment, then changed his story and said that she gave him $4,000.00 the other day.

132.    Parham then said that it was not $4,000.00, it was $3,500.00 and Bowling gave it to him last night.

133.    Detective Rodriguez asked Parham if there was any reason he did not recall that information earlier and Parham said he was smoking too much weed.

134.    Detective Koontz asked Parham why Bowling gave him the money and Parham was unable to tell Detective Koontz and Detective Rodriguez the reason.

15

135.    SA Neal and CNIU investigators conducted an unofficial investigative count of the U.S. Currency in Parham and Bowling's possession as an investigative tool.

136.    The U.S. currency was approximately $8,545.00 and $1,280.00.

137.    Detective Koontz informed Parham that the amount he claimed was under $5,000.00 but was actually $8,545.00 and that the amount Parham claimed belonged to Bowling was $1,280.00 which was more than the $6,000.00 he was claiming to travel with.

138.    Parham did not appear surprised.

139.    The pink duffel bag was in Bowling's possession and Bowling granted consent to search her duffel bag.

140.    SA Neal, assisted by Detective Limmie Blaylock, searched Bowling's duffel bag.

141.    The bundle of U.S. currency that SA Neal observed earlier was located and placed on the desk next to Bowling while the rest of the duffel bag was searched.

142.    The duffel bag had a very strong odor of marijuana emitting from it.

143.    Bowling claimed the money in the duffel bag was hers, but said she had more that she gave to Parham.

144.    Detective Rodriguez obtained Bowling's personal information and confirmed her home address.

145.    Bowling told Detective Rodriguez she was a waitress at Kenny's Bar and Grill, where she has worked for the past year.

146.    Bowling claimed that Parham had purchased her plane ticket and made all

the travel arrangements.

147.    Bowling again stated that she gave Parham $4,000.00, which she claimed to have counted just prior to giving it to him.

148.    Detective Rodriguez asked her how much money Parham had, and Bowling said that she did not know.

149.    Bowling said she gave Parham the money because she was a girl and did not want to carry that much.

150.    Detective Rodriguez asked Bowling what she was planning on doing with her money, and Bowling said it was for shopping, hotel, and food.

151.    Bowling said it took her about four to five months to save the money, and she made about $30,000.00 a year.

152.    Detective Rodriguez showed Bowling the money that was found in Parham's possession, which was in a plastic evidence bag. The currency consisted of bundled and loose currency.  Detective Rodriguez asked Bowling if she could identify any of the currency as hers.  Bowling stated that the loose bundles might be hers.

153.    Bowling maintained that $4,000.00 of the money was hers.

154.    Detective Rodriguez informed Bowling that Parham told him that Bowling did not give him money, then Parham said Bowling only gave him $600.00, then said $3,500.00.  Bowling stated that Parham must be lying.

155.    SA Neal provided Bowling with a receipt of the currency he was taking custody of, and packaged the money in front of her.  While this was occurring, Bowling stated that she actually only gave Parham $2,000.00.

156.   Bowling stated that she had counted the money and gave it to Parham the previous day.

157.   Detective Rodriguez asked Bowling why she lied about giving Parham $4,000.00, and Bowling stated that their money is the same and could not explain why she lied.

158.   Detective Rodriguez asked Bowling why Parham also would lie, and Bowling stated that she did not know.

159.   Detective Koontz explained to Parham that the money he was traveling with was going to be impounded as evidence as part of a money laundering investigation.

160.   Parham was found to have $8,545.00 in U.S. currency hidden in his carry-on backpacks.

161.   The total count of the currency in Parham's possession was $8,545.00 in U.S. currency consisted of 35 $100.00 bills, 2 $50.00 bills, 240 $20.00 bills, 8 $10.00 bills, 8 $5.00 bills, and 25 $1.00 bills.

162.   The Defendant Property primarily consisted of twenty-dollar bills. Narcotic payments often are made with twenty-dollar bills.  The Defendant Property is consistent with proceeds from street level sales of narcotics.

163.   Bowling was found to have $1,280.00 in U.S. currency hidden in her carry-on bag.   SA Neal seized the currency.  It is not part of this instant Complaint.

164.   The U.S. currency was not subjected to sniff test by a CNIU Certified Narcotic Canine because of the overwhelming odor of marijuana Parham was transporting.

165.    SA Neal conducted a records check that revealed Parham and Bowling had a criminal history including drug related charges.

166.    Upon information and belief, Parham was found to have the following criminal record:

    i.   08/13/2013:  Gary Police Department, Gary, Indiana: resisting arrest, reckless driving, fail to return to scene of accident;

    ii.   08/21/2017:  Crystal City Police Department, Crystal City,  Missouri: possession of controlled substance 35 grams or less marijuana/synthetic cannabinoid, deliver controlled substance 35 grams or less marijuana/synthetic cannabinoid, unlawful use of weapon;

    iii.   10/17/2017:  Crystal City Police Department, Crystal City, Missouri: possession marijuana.  Disposition: 12/01/2017 - guilty (fine)

    iv.   02/10/2018:  Jefferson County Sheriff's Department, Missouri: assault;

    v.   02/13/2018:  Crown Point Sheriff's Office, Indiana:  non-extradition warrant for failure to appear.

167.    Parham was deceptive when investigators initially asked if he was carrying large amounts of currency with him.  Parham stated he was not traveling with any large amounts of currency, when in fact he was in possession of $8,545.00.

168.    It is not uncommon for money carriers involved in transporting illegal criminal proceeds to separate or try to minimize the amount of money they are transporting to try to minimize the potential for discovery of all the money in their possession by law enforcement personnel.  Parham stated he did not have any large amounts of currency in his possession, yet he was in possession of $8,545.00 in his carry-on luggage.

169.   Based on the ticket tip, consensual encounter, inconsistent statements, destination/source relationship of travel, criminal history, and hiding of the currency, it is believed that the currency that was in Parham's possession was involved in illegal drug activity.

170.   Based on Parham and Bowling's travel itinerary, the last minute ticket purchase, the deceptive, inconsistent statements, hidden money, and prior drug-related criminal history, it is believed based on SA Neal and CNIU investigators' training and experience that the currency in Parham and Bowling's possession is involved in illegal drug activity.

171.   Parham went on the following flights with American Airlines (AA) and Southwest Airlines (SWA):

| DATE BOOKED | FLIGHT DATE | DEPART FROM | LAYOVER AT | ARRIVE AT | AIRLINE |
|---|---|---|---|---|---|
| 09/14/2016 | 09/14/2016 | Las Vegas, NV | N/A | Los Angeles, CA | AA |
| 10/21/2016 | 10/21/2016 | Los Angeles, CA | N/A | Chicago, IL | AA |
| 11/14/2016 | 11/15/2016 | Denver, CO | N/A | Chicago, IL | AA |
| 12/11/2016 | 12/12/2016 | St. Louis, MO | Phoenix, AZ | Long Beach, CA | AA |
| 12/21/2016 | 12/21/2016 | San Diego, CA | N/A | Chicago, IL | AA |
| 01/29/2017 | 01/29/2017 | Los Angeles, CA | N/A | Chicago, IL | AA |
| 02/08/2017 | 02/08/2017 | Los Angeles, CA | N/A | Chicago, IL | AA |
| 02/19/2017 | 02/19/2017 | St. Louis, MO | Dallas, TX | Los Angeles, CA | SWA |
| 02/24/2017 | 02/25/2017 | Los Angeles, CA | N/A | St. Louis, MO | SWA |
| 03/07/2017 | 03/08/2017 | Los Angeles, CA | N/A | Chicago, IL | AA |
| 03/31/2017 | 03/31/2017 | Chicago, IL | N/A | Los Angeles, CA | AA |
| 05/13/2017 | 05/13/2017 | Los Angeles, CA | N/A | Chicago, IL | AA |
| 05/17/2017 | 05/19/2017 | Los Angeles, CA | N/A | Chicago, IL | AA |
| 08/07/2017 | 08/09/2017 | Los Angeles, CA | N/A | St. Louis, MO | AA |
| 08/12/2017 | 08/13/2017 | St. Louis, MO | Chicago, IL | Los Angeles, CA | AA |
| 08/12/2017 | 08/15/2017 | Los Angeles, CA | N/A | St. Louis, MO | AA |
| 08/30/2017 | 08/31/2017 | Atlanta, GA | Washington, DC | St. Louis, MO | AA |
| 09/02/2017 | 09/02/2017 | Chicago, IL | N/A | Chicago, IL | AA |
| 09/09/2017 | 09/09/2017 | Los Angeles, CA | N/A | Chicago, IL | AA |
| 12/06/2017 | 12/07/2017 | St. Louis, MO | Dallas, TX | Santa Ana, CA | AA |
| 12/14/2017 | 12/14/2017 | St. Louis, MO | Chicago, IL | Santa Ana, CA | AA |
| 12/18/2017 | 12/18/2017 | St. Louis, MO | Phoenix, AZ | Santa Ana, CA | AA |
| 01/01/2018 | 01/03/2018 | St. Louis, MO | Phoenix, AZ | Ontario, CA | AA |
| 01/04/2018 | 01/04/2018 | Santa Ana, CA | Phoenix, AZ | St. Louis, MO | AA |
| 01/20/2018 | 01/20/2018 | Santa Ana, CA | Phoenix, AZ | St. Louis, MO | AA |
| 02/02/2018 | 02/02/2018 | Los Angeles, CA | N/A | Chicago, IL | AA |
| 02/22/2018 | 02/23/2018 | St. Louis, MO | Chicago, IL | Santa Ana, CA | AA |

| 02/24/2018 | 02/24/2018 | Santa Ana, CA | Phoenix, AZ | Chicago, IL | AA |
| 03/07/2018 | 03/08/2018 | St. Louis, MO | Dallas, TX | Santa Ana, CA | AA |
| 03/10/2018 | 03/10/2018 | Santa Ana, CA | Phoenix, AZ | St. Louis, MO | AA |
| 03/22/2018 | 03/23/2018 | Santa Ana, CA | Phoenix, AZ | Chicago, IL | AA |
| 06/25/2018 | 06/25/2018 | St. Louis, MO | N/A | Los Angeles, CA | AA |
| 06/26/2018 | 06/27/2018 | San Diego, CA | N/A | Chicago, IL | AA |
| 07/06/2018 | 07/06/2018 | St. Louis, MO | N/A | Los Angeles, CA | AA |
| 07/07/2018 | 07/07/2018 | San Diego, CA | Dallas, TX | St. Louis, MO | AA |
| 07/21/2018 | 07/21/2018 | St. Louis, MO | N/A | Los Angeles, CA | AA |
| 07/22/2018 | 07/22/2018 | St. Louis, MO | N/A | Los Angeles, CA | AA |
| 08/08/2018 | 08/08/2018 | St. Louis, MO | Phoenix, AZ | San Diego, CA | AA |
| 09/23/2018 | 09/23/2018 | St. Louis, MO | N/A | Los Angeles, CA | AA |

172.   Parham's flight history with AA and SWA is indicative of drug trafficking for several reasons, such as his frequent flights between a drug source location, California, and a drug destination location, the Midwest, and the little time he spent in the drug source location. Also, Parham booked his flights on the same day of, or shortly before, his flights. By way of example, on December 7, 14, and 18, 2017, Parham flew three times from St. Louis to Santa Ana, CA, and each of his flights were booked on the day of or day before his flight.  The above flight history does not include all of Parham's travel history as his return flights for these three trips are missing.  Moreover, given Parham's limited income and wages, he does not have sufficient legitimate income to afford all of these flights, much less other flights that are not included in the above listing.

173.   On October 31, 2018, Parham submitted a claim to DEA requesting a judicial determination regarding forfeiture of the Defendant Property.

## FIRST CLAIM FOR RELIEF

Based on the aforementioned facts and circumstances, the Defendant Property was furnished or intended to be furnished by a person in exchange for a controlled substance

21

or listed chemical in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, or constitutes proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, and therefore is subject to forfeiture to the United States pursuant to 21 U.S.C. § 981(a)(1)(A).

**SECOND CLAIM FOR RELIEF**

The Defendant Property constitutes or is derived from proceeds traceable to some form of specified unlawful activity, conducted and attempted to conduct a financial transaction, i.e., the movement of the proceeds of trafficking in controlled substances in violation of 18 U.S.C. § 1952, and therefore is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

**NOTICE TO ANY POTENTIAL CLAIMANT**

If you assert an interest in the subject property and want to contest the forfeiture, you must file a verified claim that fulfills the requirements set forth in Supplemental Rule G. To avoid entry of default, a verified claim must be filed no later than thirty-five days from the date this Complaint has been sent in accordance with Supplemental Rule G(4)(b).

An answer or motion filed under Fed. R. Civ. P. 12 also must be filed no later than twenty-one days after filing the claim. The claim and answer must be filed in the United States District Court for the District of Arizona under the case number listed in the caption above and a copy must be served upon the undersigned Assistant United States Attorney at the address provided in this Complaint.

This notice provision does not provide you with any legal advice and is designed only to provide you with a general understanding of these proceedings. Any statements

22

made in your claim or answer may be introduced as evidence against you in any related or future criminal case. You should consult an attorney to represent your interests in this matter, and note that a stay of proceedings may be available under 18 U.S.C. § 981(g)(2).

IF YOU ARE A VICTIM, and have sustained economic loss as a result of the crime(s) giving rise to this civil action, you may be entitled to petition for remission, mitigation, or restoration under Title 28, Code of Federal Regulations ("C.F.R."), section 9.2. In lieu of filing a Claim with the Court, you may promptly submit a letter outlining your interest in the property to the undersigned Assistant United States Attorney. Plaintiff will notify you when it has received your letter, and further instructions may be provided upon conclusion of this action. The United States Attorney General shall have sole responsibility for disposing of petitions for remission or mitigation with respect to property involved in a judicial forfeiture proceeding under 18 U.S.C. § 981(d) and 21 U.S.C. § 881(d). If your status as a victim is contested, timely receipt of your letter will not shield you from entry of default for failing to file a proper claim with the Court.

IF YOU ARE A LIENHOLDER, it is the policy of the United States Attorney's Office to honor all claims received from legitimate titled lienholders as defined under 28 C.F.R. § 9.2. In lieu of filing a claim with the Court, you may send a letter to the undersigned Assistant United States Attorney outlining your interest in the property, including: (1) the amount presently owed on the lien; (2) a copy of the security agreement setting forth your interest; and, (3) whether the owner is in default. If your lien is sufficient, Plaintiff will notify you to verify receipt of your letter. In the event of forfeiture, and to the extent practicable, proceeds from the sale and disposition of the subject property will be remitted to you in satisfaction of the lien. As noted above, timely

receipt of your letter will not shield you from entry of default for failing to file a proper claim with the Court.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States of America prays that process of warrant *in rem* issue for the arrest of the Defendant Property; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the Defendant Property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted this 29th day of January, 2019.

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*S/ Mark J. Wenker*
MARK J. WENKER
Assistant United States Attorney

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

# <u>Civil Cover Sheet</u>

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use <u>only</u> in the District of Arizona.

### The completed cover sheet must be printed directly to PDF and filed as an attachment to the Complaint or Notice of Removal.

---

| | |
|---|---|
| **Plaintiff** (s): **United States of America** | **Defendant** (s): **$8,545.00 in United States Currency** |
| County of Residence: Maricopa | County of Residence: Maricopa |
| County Where Claim For Relief Arose: Maricopa | |

Plaintiff's Atty(s):

**Mark J. Wenker , Assistant U.S. Attorney**
**40 N. Central Avenue, Suite 1800**
**Phoenix, Arizona  85004**
**602-514-7500**

Defendant's Atty(s):

---

II. Basis of Jurisdiction:          **1. U.S. Government Plaintiff**

III. Citizenship of Principal
Parties **(Diversity Cases Only)**
                    Plaintiff:- **N/A**
                    Defendant:- **N/A**

IV. Origin :                    **1. Original Proceeding**

V. Nature of Suit:              **625 Drug Related Seizure of Property 21 USC 881**

VI. Cause of Action:            **21 USC 881; 18 USC 981 - drug-related seizure of U.S. Currency**

VII. Requested in Complaint
                    Class Action: **No**
                    Dollar Demand:
                    Jury Demand: **No**

---

<u>VIII. This case</u> **is not related** to another case.

**Signature:**  <u>S/ Mark J. Wenker</u>

     **Date:**  <u>01/29/2019</u>

**If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, save this form as a PDF and include it as an attachment to your case opening documents.**

**Revised: 01/2014**

## <u>VERIFICATION</u>

I, William S. Neal, verify and declare under penalty of perjury that I am a Special Agent with the Drug Enforcement Administration, that I have read the foregoing Complaint for Forfeiture *In Rem* and know the contents, and that the matters contained in the Complaint are true to my own knowledge, except that those matters alleged upon information and belief and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case.

I verify and declare under penalty of perjury that the foregoing is true and correct. Executed on this 29th day of January, 2019.


SA William S Neal
William S. Neal, Special Agent
Drug Enforcement Administration